Filed 7/26/23  P. v. Thomas CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>HUNTER DALE THOMAS et al.,<br><br>    Defendants and Appellants. | F083367/F083528<br><br>(Super. Ct. Nos. BF166502E & BF166502B)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant Hunter Dale Thomas.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant Shane Devon Carr.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Brook A. Bennigson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellants and codefendants Hunter Dale Thomas and Shane Devon Carr filed separate appeals following their convictions in a joint jury trial on charges arising from a 2016 home invasion robbery. We ordered their appeals consolidated. For the reasons set forth below, we find substantial evidence supports Thomas's and Carr's convictions for aggravated kidnapping and, pursuant to the multiple-victims exception, we find the trial court's imposition of sentences for both aggravated kidnapping and aggravated robbery was not unauthorized under Penal Code section 654.[1] However, we reverse Thomas's and Carr's convictions for robbery because robbery is a lesser included offense of aggravated robbery, and we remand for resentencing in light of Assembly Bill No. 518 and Senate Bill No. 567.[2]

## PROCEDURAL BACKGROUND

### I. Charges, Convictions, and Sentences

In 2017, Thomas and Carr, along with codefendants Hector Garza, Michael Parker and Juan Delgado, were charged in a 19-count information based on two separate home invasion robberies. Thomas, Carr and Garza were involved in the first robbery in November 2016, and Carr, Parker and Delgado were involved in the second robbery in February 2017. Prior to trial, the court granted Carr's motion to sever the charges related to the 2017 robbery, and Garza entered into a plea agreement pursuant to which he testified against Thomas and Carr.

In April 2021, Thomas and Carr were convicted, as charged, of burglary in the first degree (§ 460, subd. (a); count 1), kidnapping to commit robbery (aggravated kidnapping) (§ 209, subd. (b)(1); count 3), robbery in the first degree in concert (aggravated robbery) (§ 213, subd. (a)(1)(A); count 5), and robbery in the first degree

---

[1] All further references are to the Penal Code unless otherwise stated.

[2] Assembly Bill No. 518 (2021–2022 Reg. Sess.) (Assembly Bill 518) and Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill 567).

2.

(§ 212.5, subd. (a); count 12). Carr was also convicted of possession of ammunition by a felon (§ 30305, subd. (a)(1); count 11). In a bifurcated proceeding, the trial court found that Carr was on bail at the time of the offenses (§ 12022.1, subd. (a)), and that he had one prior serious or violent felony conviction within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)). With respect to all counts except for count 11, the court found the prior felony conviction enhancement allegations against Carr true.[3] (§ 667, subd. (a)(1).)

In September 2021, Thomas and Carr were sentenced during the same hearing. For aggravated kidnapping, Thomas was sentenced to a mandatory term of life in prison with the possibility of parole after a minimum of seven years and for aggravated robbery, he was sentenced to a consecutive upper term of nine years. The court also imposed upper terms of six years for burglary and for robbery, stayed under section 654.

Pursuant to the Three Strikes law, Carr was sentenced to a mandatory term of life in prison with the possibility of parole after a minimum of 14 years for aggravated kidnapping, with an additional two years for the on-bail enhancement and an additional five years for the prior serious felony conviction enhancement. For aggravated robbery, Carr was sentenced to a doubled upper term of 18 years, with an additional five years for the prior serious felony conviction enhancement, and for unlawful possession of ammunition, Carr was sentenced to one-third of the two-year middle term, doubled to 16 months. Finally, Carr was sentenced to upper terms of six years for burglary and for robbery, doubled to 12 years each and stayed under section 654.[4]

---

[3]     The enhancement allegation attached to count 11 was dismissed.

[4]     After the jury returned its verdicts in this case, Carr, along with Parker and Delgado, resolved the pending charges related to the 2017 home invasion robbery. Carr pleaded no contest to count 14 in the information, aggravated robbery, and admitted the prior strike allegation in exchange for a consecutive sentence of one-third of the six-year middle term, doubled to four years, and dismissal of the remaining counts and allegations. Carr also pleaded no contest in Kern Superior Court case No. BF165035A to unlawful possession of a firearm, in violation of section 29800, subdivision (a)(1), in exchange for a consecutive sentence of

## II. Claims Raised on Appeal

Thomas and Carr challenge their convictions for aggravated kidnapping as unsupported by substantial evidence that the movement of the two victims was substantial, was beyond that merely incidental to the commission of robbery, and increased the risk of harm over and above that necessarily present in the underlying robbery.  (§ 209, subd. (b)(2).)  They also seek reversal of their convictions for robbery on the ground that it is a lesser included offense of aggravated robbery; and they claim that under section 654, the trial court erred when it concluded they harbored multiple intents and objectives, thereby permitting the imposition of unstayed sentences for both aggravated kidnapping and aggravated robbery.  Finally, they seek remand for resentencing in light of Assembly Bill 518 and Senate Bill 567, both effective January 1, 2022.

The People dispute Thomas's and Carr's entitlement to relief from their aggravated kidnapping convictions, but concede entitlement to reversal of their convictions for robbery and to remand for resentencing under Assembly Bill 518 and Senate Bill 567.  Given the need for remand for resentencing, the People contend it is unnecessary for us to reach the merits of Thomas's and Carr's claims that the trial court imposed an unauthorized sentence under section 654 with respect to aggravated kidnapping and aggravated robbery.

In accordance with Government Code section 68081, we provided the parties with the opportunity to address the multiple-victims exception to section 654 applicable to violent crimes.  (*People v. Correa* (2012) 54 Cal.4th 331, 341 (*Correa*).)  Thomas and Carr did not file letter briefs.  The People respond both that the multiple-victims

one-third of the two-year middle term, doubled to 16 months.  Carr was sentenced, in total, to an indeterminate term of life in prison with a minimum parole eligibility date of 14 years and a determinate term of 36 years 8 months.

exception applies and that the trial court properly determined Thomas and Carr harbored separate intents and objectives.

We reject Thomas's and Carr's substantial evidence challenge to their convictions for aggravated kidnapping, and we affirm the trial court's imposition of unstayed sentences for aggravated kidnapping and aggravated robbery based on the multiple-victims exception to section 654.[5]  We agree with the parties that Thomas's and Carr's convictions for robbery must be reversed as lesser included offenses of aggravated robbery and that remand for full resentencing is appropriate in view of Assembly Bill 518 and Senate Bill 567.  We otherwise affirm the judgment.

## FACTUAL SUMMARY[6]

### I.      Home Invasion Robbery

#### A.      Victims' Testimony

James and his wife, Caroline, both in their 60's, were asleep in their bedroom when they awoke to the sound of knocking on their front door at approximately 3:48 a.m. Caroline remained in the bedroom and James went to the front door, which was in the living room.  James asked who was there and a male voice said, "'Luis.'"  James cleaned and repaired mechanical equipment in his backyard, and he was sometimes assisted by a man named Luis, so he opened the door.

Instead of Luis, however, James saw a tall Black man.  When James asked the man who he was, the man pushed James backward and entered the house.  The man was followed in by a second tall Black man and a shorter Hispanic man.[7]  James described all

---

[5]      In light of this conclusion, we do not reach Thomas's and Carr's claim that the trial court erred in finding multiple intents and objectives.  On remand for full resentencing, the parties may raise any arguments they deem relevant to the trial court's sentencing choices under Assembly Bill 518 and Senate Bill 567.

[6]      After the parties agreed to one stipulation proposed by Carr, Thomas and Carr rested without presenting any evidence.

[7]      Garza, who is Hispanic, testified that he committed the crimes with Carr, who is Black, and Thomas, who is White.  Given that identity was a contested issue at trial and that there were

three men as young, and testified they wore masks and carried dark colored handguns, which appeared real to him. At least two of the men wore sweatshirts or jackets with the hoods pulled up. The first man pushed James to the living room floor, held a gun to the back of his head, and asked if anyone else was in the house. James said his wife was and pointed to the bedroom. James testified the second Black man then went toward the bedroom and James heard the door break.

Caroline testified that she could tell something was wrong from the sounds she heard after James answered the door, so she locked their bedroom door and called 911 from her cell phone. She only had time to relay their street address before the bedroom door was kicked open by someone she described as a Hispanic male holding a black handgun and wearing shorts, a hooded sweatshirt, and a mask. The man picked up Caroline's cell phone, which she had dropped to the floor when the door was kicked open, and he grabbed her purse, turned it upside down to empty the contents, and took cash from her wallet.

The Hispanic man told Caroline to go to the living room and she complied, seating herself on the couch. She saw two Black men in the living room with the hoods of their shirts up. Like James, she thought the men were young, in their 20's or 30's, and she testified that all three had black handguns, gloves, and used blue-flowered bandanas as masks. She tried to avoid looking at the men out of fear, though, and she did not recall where James was. The men had rope with them and moved to tie James and Caroline up, but did not follow through with it. James thought the second Black man had the rope when he entered the house, while Caroline said it was the Hispanic man who tried to tie her up.

---

inconsistencies in the evidence concerning who did what inside the house, we include the victims' descriptions of the men in the factual summary.

### 1. James's Version of Events

James testified that after Caroline was brought into the living room, she sat on the floor next to him, and all three men kept asking them where their money and safe were located. James responded that they did not have anything, but the men did not believe him and threatened to kill Caroline. While the first Black man who entered the house held James and Caroline at gunpoint, the other two men rummaged through the house. The two then returned to the living room, and the second Black man pointed his gun at Caroline and threatened to kill her. They did not have a safe, but James knew Caroline kept money somewhere and, fearing for her, he told her to get the money and give it to them.

James testified that Caroline agreed, and the second Black man took her to the bedroom she used as an office, which was located in a back corner of the house.[8] Caroline gave the man the money, and once all three men were back in living room with James and Caroline, there was a knock on the front door and an officer called out, "'Police. Anybody there? Everything okay?'" The first Black man directed the Hispanic man to take James and Caroline to her office in the back corner of the house, which was approximately 16- to 20-feet away from the front living room. The Hispanic man told James and Caroline to shut up and walked them to the back room at gunpoint. They sat on the floor while the police were outside the house.

James estimated they were in Caroline's office with the Hispanic man for approximately 10 minutes. While they were in there, the Hispanic man asked for James's debit card, which was in his wallet, and the PIN number, which James provided. One of the other two men opened the office door, reported the police were gone, and said,

---

[8]    James described their house as small, with three bedrooms located on the same side, none with exit doors. Carolyn used the back corner bedroom for storage and as an office, and James used the front corner bedroom for his office. At the time of the robbery Caroline said she had between $2,800 and $3,000 in an envelope on her desk.

"'Let's go.'" The Hispanic man asked for James's truck key and if there was a backyard exit. Caroline retrieved the key from their bedroom and James told the man there was a back exit. The Hispanic man then left the office and James heard noise at the back door.

The Hispanic man returned shortly and asked for Caroline's car key because James's truck had a manual transmission. The man was still armed with a gun and he left again after James gave him the car key. James stayed in the office with Caroline for another 10 or 15 minutes, and they then went next door to their neighbor's house. James's cell phone was taken by someone during the robbery, but he had another cell phone in the house, which he used to call 911.

### 2. Caroline's Version of Events

Caroline recalled the events inside the house somewhat differently. She testified that after the bedroom door was kicked open and she was taken into the living room where the other two men were, all three men demanded money and their safe. The couple did not have a safe or much money, but she felt she had better give the men whatever they had so she said she had money in her office. She and the Hispanic man then went to her office. While in there, police knocked at the front door and the man told her not to make a sound. After the police left, she handed him an envelope with between $2,800 and $3,000 in it. She testified that neither James nor the other two men were in the office, but she could hear the two men moving around the house.

Caroline heard one of the men ask James for a car key. The men went outside, and then someone returned and asked for her car key. She gave her key to James and the man left with it.

### 3. Theft of Property

James's and Caroline's cell phones, the money from the envelope, James's bank card, and Caroline's car were stolen. In addition, James told a responding police officer that the men had taken $100 or so from his wallet; and Caroline testified that some cash

8.

was taken from her wallet and a gold necklace she kept in one of her purses was missing, although she did not see it taken.

### B. Garza's Testimony

Garza reached a plea agreement with the prosecution approximately one year after the crime and testified against Thomas and Carr. Garza testified that hours before the home invasion robbery, Carr, whom he knew as "Shitty," approached him at the motel where he lived. At the time, he was standing outside of room 236, which was rented by a man known as "Snoop" and frequented by drug buyers and users. Carr told Garza "he had a come-up," meaning a way to make fast money. The two went inside room 236, where they were alone, and Carr told Garza he knew where there was supposed to be some money. They agreed to meet around 4:00 a.m.

Garza did not know there would be a third person involved, but when he met up with Carr in front of the motel, Thomas was also there. After first testifying that he had never spoken to Thomas before, Garza admitted on cross-examination that he was familiar with both Thomas and Carr from living at the motel. Carr drove to the victims' house and parked on a nearby street. While Thomas knocked on the front door, Carr and Garza waited in the yard next door. Thomas and Carr were carrying replica handguns that looked like real Glock pistols, and Garza had a backpack on, but he denied he was armed.[9] A man answered the door and Thomas forced his way inside. Carr and then Garza entered behind Thomas and shut the door.

When Garza entered, the male victim was on the floor in the living room and Thomas was standing next to him pointing a gun at him. Garza saw the female victim, who was on her cell phone, run into the back room. He followed her, kicked the door open, grabbed the cell phone from her hand, and put the phone in his pocket. He did not

---

[9] At trial, Garza identified the pistol carried by Carr as the one found in the backyard after the robbery, and the pistol carried by Thomas as the one later found in room 236 at the motel.

hear the victim give her address over the phone, but she was screaming. He forced her down the hall into the living room, where she sat on the floor. Thomas was still next to the male victim, and Carr was searching through the house.

As the female victim cried, the male victim attempted to comfort her. Garza picked up one of the replica firearms from the couch and told the man, "'Be quiet or I'll fucking kill you.'" Thomas asked where the money was and the female victim told him there was some in her purse. Thomas then left the room and Garza could hear him in another room. He returned carrying a white envelope. Garza testified he never saw what was inside the envelope and did not see Thomas or Carr look inside it.

At some point, all three of them were in the living room with the two victims and Garza took rope out of his backpack. He testified he planned to tie the victims up, but ended up not doing so "[b]ecause it just didn't feel right." Garza and Thomas, who were holding the guns then, subsequently forced the victims to move from the living room to the female victim's office and get down on the floor so they would be out of the way. Carr joined them in the office, and they then heard police knocking at the front door. They told the victims to be quiet. While police continued knocking on and off, Carr left the office. A few minutes later, Thomas also left the office. While he could still hear police outside, Garza heard the click of the back door opening, and he did not see Thomas and Carr again until they met up at the motel later.

Garza stayed in the office for a while with the victims after Thomas and Carr left and waited for the police to leave. As Garza waited, Carr called his cell phone multiple times and he testified he answered one of those calls. Right before he left the office himself, Garza demanded the victims' vehicle key and he took a bank card out of the male victim's wallet, which was lying on the floor. He denied asking for the PIN, however, and said it was on a piece of paper in the wallet.

Garza testified he left the house through the front door. He saw the victims' truck was a stick shift and did not want to deal with it, so he went back inside the house and

10.

demanded the keys to the car, gun still in hand. The male victim handed over the other keys and he drove off in the victims' Lexus. After leaving the victims' house, but before returning to the motel, Carr called Garza at 4:21 a.m. and they spoke for approximately five minutes, and Garza called Carr at 4:43 a.m. and they spoke for approximately three and one-half minutes. Garza testified he drove back streets to a gas station, where he used the bank card to withdraw money at approximately 5:00 a.m. He then walked to the motel, which was nearby.

Garza still had the female victim's cell phone in his pocket. He testified that Carr and Thomas did not know he took the phone, and he did not tell them he took the bank card and withdrew money. Back at the motel, Garza went to room 236. Carr and Thomas were in the room with Snoop. Garza asked why they left him behind, which they both denied. He responded, "'Bullshit,'" and then asked what happened to the money. Carr told him there was no money.

## II.     Timeline Stipulations, 911 Calls, and Police Response

The parties stipulated to the following timeline.[10] At 3:48 a.m., Caroline made a call to 911 from her phone. At 3:50 a.m., officers were dispatched to the residence. At 3:52 a.m., a second 911 call was made from Caroline's phone, which evidence established lasted about five minutes and 40 seconds. Between 3:56 a.m. and 3:58 a.m., Officers Malley, Hernandez, and Celedon each arrived at the residence.

At 4:00 a.m., a third 911 call was made from Caroline's phone. Between 4:06 a.m. and 4:07 a.m., Officers Malley, Celedon, and Hernandez each cleared and left the scene.

---

[10]     We omit reference to the seconds, which were included in the stipulation. The parties stipulated to five 911 calls and four calls were played for the jury. In testimony, James and Caroline referred to only two calls, one made by Caroline from the bedroom and one made by James after the three suspects left.

11.

At 4:40 a.m., James called 911 from his neighbor's phone, and officers were dispatched to the residence at 4:42 a.m.  At 4:49 a.m., James made a second 911 call.

Officer Malley, who arrived at 3:56 a.m. in response to Caroline's first 911 call, testified that numerous times, he knocked on the front door using his hand, boot, and baton, and announced "police."  The side yard gates were locked so Malley did not enter the backyard of the residence, but he also knocked on a side door that was located on the street side of the fenced side yard.  Both doors were locked, and he used his flashlight to peer into windows, but was unable to see anything through the closed blinds.  He eventually left because he did not hear or see anything, and he did not believe grounds for a forced entry existed.

Four 911 calls were played for the jury.  The initial call at 3:48 a.m. reflected Caroline was screaming and gave only their street address before the call ended.  The majority of the second call at 3:52 a.m. was unintelligible, but Caroline was crying and unknown male voices said, "Shut up," "Stop right now," and "Shut up … everyone shut up."  At the end of that call, an unknown male voice asked what James's PIN number was, James provided it, and the male repeated the PIN back.  Caroline did not know which of the three men the voices on the recording belonged to.  The third call at 4:00 a.m. consisted of a knocking sound.  Finally, James and Caroline both spoke to the 911 operator from inside their neighbor's house.  They reported three men broke into their house.  Caroline identified one man as Black, and James thought two were Black and one was Hispanic.  He also reported that all three men had guns.

III.    **Cell Phone Location and Security Camera Footage**

After James and Caroline reported the robbery, a location ping from Caroline's stolen cell phone placed the phone at a motel in Bakersfield, approximately a five-minute drive from their house.  Based on the location of the ping, which was in the middle of the west wing of the motel, police focused on surveillance footage from multiple video cameras in that area of the motel between 4:00 a.m. and 6:00 a.m., approximately.

12.

One Black man, one White man, and one Hispanic man, identified as Carr, Thomas, and Garza, were all on the motel premises at various times during the relevant timeframe. They were seen entering and exiting room 236, which was rented to a man named W.J., who went by the nickname "Snoop." At 5:28 a.m., Carr, Thomas, and Garza were in room 236 together, and they subsequently exited the room and walked to the front entrance of the motel. When police later searched room 236, they located a black and tan Airsoft pistol, which Garza identified in his testimony as the gun used by Thomas during the robbery.

## IV. Garza's, Carr's, and Thomas's Arrests

Garza was arrested three days after the robbery and transported to the police station for interrogation.[11] Confronted with a photo of himself using James's bank card at the gas station, Garza told detectives that he found the card, with the PIN on it, while walking down the street. He subsequently admitted committing the robbery with Carr, whom he knew as "Shitty," and Thomas. Garza told detectives that he met up with Carr in room 236, and that Carr had a black gun and Thomas had an "army standard issue … brown" gun that night.

Carr was also arrested three days after the crime, as he exited the back door of a residence where his wife and children were present. Officers located four boxes of live ammunition in a closet on the top shelf and a Samsung cell phone in the main bedroom.[12] Carr had approximately $154 on him and no additional cash was located inside the house.

During interrogation, Carr admitted to possessing the ammunition found in the closet. He initially denied making calls to Garza's phone number, but subsequently admitted to it, and he denied that his DNA would be found on the gun or the mask that

---

[11] Garza's videorecorded interrogation was played for the jury.

[12] With respect to count 11, possession of ammunition by a felon, the parties stipulated Carr had a prior felony conviction.

13.

were found in the backyard of James's and Caroline's house. Carr told detectives that on the date of the robbery, he had just returned from Los Angeles with his wife, after which he went to the motel around 4:00 a.m. Carr said W.J. had a brown and black replica firearm in his motel room that Carr had touched.

Thomas was arrested almost three weeks after the crime. The record reflects that at the time, he was wearing make-up that darkened his skin tone.

## V. Cell Phone Activity Between Garza's and Carr's Phones

Data was extracted from Carr's and Garza's cell phones. Garza had Carr's number saved in his contacts as "Shitty." At 3:21 a.m., Carr called Garza and they had a 51-second phone conversation. Between 4:05 a.m. and 4:18 a.m., Garza had eight missed calls from Carr's number. At 4:21 a.m., after Garza said he had left James's and Caroline's residence, Carr called Garza and they spoke for almost five minutes. Garza had 10 missed calls from Carr's number between 4:27 a.m. and 4:43 a.m. before Garza made an outgoing call to Carr at 4:43 a.m. and spoke to him for three minutes and 31 seconds. Garza then had another missed call from Carr's number at 4:50 a.m. A text message was also sent from Carr's phone to Garza's phone at 4:36 a.m. that read, "Bro answer the phone."

## VI. Fingerprints and DNA Evidence

The victims' stolen Lexus was located two days after the robbery. The parties stipulated that the police examined the car for fingerprints, and Garza's prints were located on the exterior of the driver's door. Carr, Thomas and W.J. were excluded as providers of the fingerprints found on the car.[13] There were no fingerprints with comparison value located on the victims' truck.

---

[13] W.J. rented room 236 and B.S. rented room 224 at the motel. Both were Black men in their 30's whose DNA was submitted by police for comparison during the course of the investigation. In addition, W.J.'s fingerprints were submitted for comparison.

DNA was collected for analysis from four items: a rope found inside the victims' house, and a black Airsoft pistol, an ammunition magazine, and a black fabric mask found in the corner of the victims' backyard, by the fence separating the backyard and the alleyway. A mixture of DNA from multiple individuals was obtained from each of the four items. Reference samples were collected from Carr, Thomas, Garza, James, Caroline, W.J. and B.S.; and for all four items, W.J. and B.S. were excluded as potential contributors.

There were at least five contributors to the DNA mixture on the gun found in the backyard. The results were inconclusive as to Thomas, Garza and Caroline, meaning there was insufficient data to either include them or exclude them as potential contributors. Neither Carr nor James could be excluded as potential contributors. The likelihood that the mixture contained Carr's DNA versus a coincidental match to a random unrelated individual was between 620 septillion and 11 octillion, and the likelihood that the mixture contained James's DNA versus a coincidental match to a random unrelated individual was between 2 million and 13 million.[14]

With respect to the gun's magazine, there were at least two contributors to the DNA mixture. Thomas, James and Caroline were excluded as potential contributors, but Carr and Garza were not. The likelihood that the mixture contained Carr's DNA versus a coincidental match to a random unrelated individual was between 600 septillion and 11 octillion, and the likelihood that the mixture contained Garza's DNA versus a coincidental match to a random unrelated individual was between 80 quintillion and 16 sextillion.

---

[14]    In Kern County, the three reporting groups, based on size, are Black, Caucasian, and Hispanic. James is Asian and the prosecution's criminalist testified that the results for Asians or Asian-Americans would be closer to the lower end of the statistical range. The criminalist also explained that higher statistics, such as the results for Carr versus the results for James, indicate a greater amount of DNA deposited.

There were at least three potential contributors to the DNA found on the mask. Caroline, James and Carr were excluded as potential contributors, but Thomas and Garza were not. The likelihood that the mixture contained Thomas's DNA versus a coincidental match to a random unrelated individual was between 550 quadrillion and 1.3 sextillion, and the likelihood that the mixture contained Garza's DNA versus a coincidental match to a random unrelated individual was between 59 trillion and 30 quadrillion.

Caroline was excluded as a potential contributor to the DNA mixture obtained from the rope, and the results were inconclusive as to Carr, Thomas, and James. Garza could not be excluded as a potential contributor, and the likelihood that the mixture contained Garza's DNA versus a coincidental match to a random unrelated individual was between 2.5 million and 29 million.

## DISCUSSION

### I.        Substantial Evidence Claim

#### A.        Standard of Review

Thomas and Carr claim they are entitled to reversal of their convictions for aggravated kidnapping because the evidence of asportation is insufficient. The applicable standard of review is well established. "The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense" (*Carella v. California* (1989) 491 U.S. 263, 265, citing *In re Winship* (1970) 397 U.S. 358, 364), and the verdict must be supported by substantial evidence *(People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*)). On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence "'is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.) "The record must disclose substantial evidence to support the

16.

verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Zamudio, supra*, at p. 357.)

"In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*Zamudio, supra*, 43 Cal.4th at p. 357.) "'[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt ….'" (*People v. Nguyen, supra*, 61 Cal.4th at pp. 1055–1056.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict" (*Zamudio, supra*, at p. 357), but "speculation, supposition and suspicion are patently insufficient to support an inference of fact" (*People v. Franklin* (2016) 248 Cal.App.4th 938, 951; accord, *People v. Marshall* (1997) 15 Cal.4th 1, 35; *People v. Xiong* (2013) 215 Cal.App.4th 1259, 1268).

## B. Aggravated Kidnapping

Section 209 mandates a sentence of life in prison with the possibility of parole for kidnapping for the purpose of committing robbery or certain sex offenses, including rape. (*Id.*, subd. (b)(1).) "The essence of aggravated kidnapping is the increase in the risk of harm to the victim caused by the forced movement." (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1152 (*Dominguez*).) Relevant to Thomas's and Carr's claim, the asportation element for aggravated kidnapping requires a showing of "movement of the victim that is not merely incidental to the commission of the robbery *and* that increases the risk of harm over that necessarily present in the crime of robbery itself" (*People v. Delgado* (2013) 56 Cal.4th 480, 487, italics added, citing § 209, subd. (b)(2), & *People v.*

*Rayford* (1994) 9 Cal.4th 1, 12 (*Rayford*)).**15**  The inquiry is fact-specific and based on the totality of the circumstances.  (*Dominguez, supra*, at p. 1152.)

The California Supreme Court addressed the history of aggravated kidnapping in *Dominguez*, explaining, "Concerned in *People v. Daniels* (1969) 71 Cal.2d 1119 (*Daniels*) that the '"criminologically nonsignificant circumstance that the victim [of a robbery] was detained or moved *incident* to the crime"' resulted in a much harsher penalty [citation], we held that the Legislature, in creating the crime of aggravated kidnapping (at that time, kidnapping for ransom, reward, extortion or robbery), intended to exclude those situations in which the movement of a robbery victim was 'merely incidental to the commission of the robbery and [did] not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself' [citation]." (*Dominguez, supra*, 39 Cal.4th at pp. 1149–1150.)**16** Determining whether forced movement of a victim is merely incidental to the underlying crime and increases the risk of harm to the victim, however, "is difficult to capture in a simple verbal formulation that would apply to all cases." (*Dominguez, supra*, at p. 1151, citing *Rayford, supra*, 9 Cal.4th at p. 12.)

---

**15**     Section 209 provides, "This subdivision shall only apply if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense."  (*Id.*, subd. (b)(2).)

**16**     "Prior to 1990, the crime of aggravated kidnapping did not include kidnappings that were committed for the purpose of rape.  'The crime of aggravated kidnapping was enlarged in 1990 to include kidnapping for enumerated sex crimes.  (Stats.1990, ch. 1560, § 1, p. 7329.)' [Citation.]  To effectuate this change, the Legislature amended former section 208 to include kidnapping for the purpose of enumerated sex crimes." (*People v. Robertson* (2012) 208 Cal.App.4th 965, 979 (*Robertson*), citing former § 208, subd. (d), & citing & quoting *Dominguez, supra*, 39 Cal.4th at p. 1150.)

"In 1997, the Legislature revised [section 209] to define aggravated kidnapping as kidnapping to commit robbery or certain sex offenses, and modified the asportation standard by eliminating the requirement that the movement of the victim '*substantially*' increase the risk of harm to the victim." (*People v. Vines* (2011) 51 Cal.4th 830, 869, fn. 20 (*Vines*), italics added, overruled on another ground in *People v. Hardy* (2018) 5 Cal.5th 56, 103–104; accord, *Robertson, supra*, 208 Cal.App.4th at p. 979.)

"[T]he jury must 'consider[] the "*scope and nature*" of the movement,' as well as '*the context of the environment in which the movement occurred*.' (*Rayford, supra*, 9 Cal.4th at p. 12, italics added; see *People v. Aguilar* (2004) 120 Cal.App.4th 1044, 1051 [emphasizing the context of the movement].) This standard suggests a multifaceted, qualitative evaluation rather than a simple quantitative assessment. Moreover, whether the victim's forced movement was merely incidental to the [underlying crime] is necessarily connected to whether it substantially increased the risk to the victim. 'These two aspects are not mutually exclusive, but interrelated.'"[17] (*Dominguez, supra*, 39 Cal.4th at pp. 1151–1152, quoting *Rayford, supra*, at p. 12.)

"We have articulated various circumstances the jury should consider, such as whether the movement decreases the likelihood of detection, increases the danger inherent in a victim's foreseeable attempts to escape, or enhances the attacker's opportunity to commit additional crimes." (*Dominguez, supra*, 39 Cal.4th at p. 1152, citing *Rayford, supra*, 9 Cal.4th at p. 13.) "Although any assessment of the *Daniels/Rayford* test necessarily must include a consideration of the actual distance the victim was forced to move [citation], we have repeatedly stated no minimum distance is required to satisfy the asportation requirement [citation], so long as the movement is substantial [citation]. [¶] Measured distance, therefore, is a relevant factor, but one that must be considered in context, including the nature of the crime and its environment. In some cases a shorter distance may suffice in the presence of other factors, while in others a longer distance, in the absence of other circumstances, may be found insufficient." (*Dominguez, supra*, at p. 1152.)

---

[17] Although the decision in *Dominguez* postdated the 1997 amendment eliminating the requirement that the movement substantially increase the risk of harm, *Dominguez* addressed the prior version of the statute, which was in effect at the time of the crime. (*Robertson, supra*, 208 Cal.App.4th at p. 980.)

### C. Analysis

#### 1. Procedural Background

After the parties rested, Thomas brought a motion for dismissal of all charges against him under section 1118.1, and Carr joined in the motion with respect to aggravated kidnapping. Relevant to aggravated kidnapping, Thomas acknowledged there were differing versions of events, but argued, "Either way, avoiding detection of the police I think is inherent in the commission of the robbery, the underlying offense, and thus is not more than what is necessary to commit the robbery." Relying on this court's decision in *Robertson*, the prosecutor focused on the increased risk of harm to the victims in moving them to the back room, and he stated that the movement was not merely incidental to the robbery because the victims did not need to be moved for the suspects to take what they wanted. (*Robertson, supra*, 208 Cal.App.4th 965.) Thomas responded that moving the victims either to the location of the money or to keep them out of the way was merely incidental to the robbery.

The trial court denied the motion in light of James's testimony that when police knocked, all three suspects were in the living room with Caroline and James, and she had already given the men the envelope of money. After Officer Malley knocked at the front door and announced himself, James and Caroline were taken at gunpoint to the office in the back corner of the house, where they were told not to make any noise. James's testimony, the court concluded, supplied "substantial evidence to substantiate and justify an increased likelihood of harm not incidental to the commission of a robbery."

On appeal, Carr and Thomas claim that their aggravated kidnapping convictions are not supported by substantial evidence that the movement of James and Caroline was substantial, was beyond that merely incidental to the commission of robbery, and increased the risk of harm over and above that necessarily present in the underlying robbery. On the facts of this case, we agree with the trial court's reasoning.

### 2. Testimony of James Sufficient to Support Asportation Element

Accounts of what occurred inside the house varied by witness. However, "[i]n deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181; accord, *People v. Ramirez* (2022) 13 Cal.5th 997, 1118.)

James testified that he and Caroline were moved from the living room in the front of the house to Caroline's office in the back of the house after police arrived and knocked at the front door. Although James testified the house was small, he estimated they were moved between 16 and 20 feet, and there is no minimum number of feet a defendant must move a victim in order to satisfy the first prong. (*Dominguez, supra*, 39 Cal.4th at p. 1152, citing *Rayford, supra*, 9 Cal.4th at p. 12; accord, *Robertson, supra*, 208 Cal.App.4th at p. 984.) Critically, the location change in this case did not occur in the context of merely facilitating the underlying robbery, such as movement for the purpose of assisting the robbers in gaining access to property to steal, movement for the purpose of keeping the victims under the direct control of the robbers as they carried out the underlying crime, or movement directed at confining the victims out of the robbers' way as they carried out the underlying crime.[18] Rather, in direct response to the arrival of the

---

[18]  See, e.g., *People v. Daniels* (1969) 71 Cal.2d 1119, 1122–1125, 1140 (*Daniels*) (movement of first victim to backseat of car and other three victims inside their residences facilitated and were merely incidental to crimes of rape and robbery); *People v. Taylor* (2020) 43 Cal.App.5th 1102, 1104–1105 (backing victim up three or four steps at gunpoint into dark alley to rob him of wallet merely incidental to robbery); *People v. Williams* (2017) 7 Cal.App.5th 644, 669–671 (*Williams*) (movement of victims in retail stores to out-of-view rear areas where merchandise and/or money were kept merely incidental to robberies); *People v. Perkins* (2016) 5 Cal.App.5th 454, 470 (movement of victim from bathroom, where she was sexually assaulted, to bedroom where she was sexually assaulted again merely incidental to underlying assaults and did not substantially increase her risk of harm); *People v. James* (2007) 148 Cal.App.4th 446, 457–

police knocking and announcing themselves at the front door, the victims were herded at gunpoint from the living room where the front door was to a room in the back of the house approximately 16- to 20-feet away with no exit door. Furthermore, there is evidence from which a reasonable trier of fact could conclude that all three robbers were hiding in the office with the victims for some time while police pounded on the door and tried to peer into the house.

A different outcome might be compelled if the evidence showed only that, before police arrived, Caroline went to her office with one of the men to retrieve money, as she testified; or that, before police arrived, James and Caroline were moved to her office merely to get them out of the way, as Garza testified. We are required to view the evidence in the light most favorable to the prosecution, however, and based on James's testimony, we disagree with Thomas and Carr that the movement of the victims from the living room to the back office was merely incidental to the underlying taking of the victims' personal property.

Moreover, moving the victims out of the living room where the front door was located and into a back room with no exit supports a finding of increased risk of harm to the victims. "'"The fact that these dangers do not in fact materialize does not … mean that the risk of harm was not increased."'" (*Vines, supra*, 51 Cal.4th at p. 870.) Harm may be either physical or mental and "substantial movement of a victim, by force or fear, which poses a[n] … increase in the risk of psychological trauma to the victim beyond that

458 (moving maintenance worker at gunpoint from parking lot to locked front door, where robbers used him to gain entry, and then inside club, where they then robbed the managers, merely incidental to underlying robbery); *People v. Washington* (2005) 127 Cal.App.4th 290, 295, 299 (*Washington*) (movement of victims to vault directly facilitated theft of money from vault); *People v. Hoard* (2002) 103 Cal.App.4th 599, 602, 607 (movement of store employees to back office, where the defendant left them restrained while he emptied jewelry cases, merely incidental to robbery of the jewelry); compare with *Vines, supra*, 51 Cal.4th at pages 870–871 (moving victims of a restaurant robbery downstairs to basement and locking them in freezer not merely incidental to robbery and substantially increased risk of harm).

to be expected from a stationary robbery" may support aggravated kidnapping.[19] (*People v. Nguyen, supra*, 22 Cal.4th at p. 886.)  In this case, the location change reduced the likelihood that the police would detect the crime in progress, either by hearing noise or seeing movement through the window blinds; it cut off the direct, most viable escape route for the victims; and it reduced the likelihood that the victims would be heard if they decided to scream for help.  (*Vines, supra*, at p. 871 [decreased likelihood of detection, danger inherent in attempting to escape]; *Robertson, supra*, 208 Cal.App.4th at pp. 985–986 [movement of victim away from door to front of detached garage reduced possibility of escape, made it less likely she could be heard by son if she screamed, increased victim's fear and the defendant's psychological control over her].)[20]  Although the victims were not physically injured, both testified that all three men were armed with handguns,[21] and James testified that in response to the knocking, one of the men took them to the back room, raised his gun at them, and told them to shut up.  James also testified that he stayed quiet because he believed that if he made any noise, he might be in

---

**19**     As in *Dominguez*, discussed in footnote 17, the statute in effect at the time of Nguyen's 1995 crime required a substantial increase in the risk of harm to the victim.  (*People v. Nguyen* (2000) 22 Cal.4th 872, 888, fn. 2 (conc. & dis. opn. of Chin, J.); see *Robertson, supra*, 208 Cal.App.4th at pp. 979–980.)

**20**     As Thomas points out, in *Robertson*, this court reasoned that "'[a] rape victim is certainly more at risk when concealed from public view and therefore more vulnerable to attack'" (*Robertson, supra*, 208 Cal.App.4th at p. 985, quoting *People v. Hoard, supra*, 103 Cal.App.4th at p. 607), and noted that "[k]idnapping for the purpose of robbery is not analogous to kidnapping for the purpose of rape" (*Robertson, supra*, at p. 986).  This court's observation was made in the context of addressing the specific arguments raised by the appellant in *Robertson*, however, which involved kidnapping to commit rape.  As *Robertson* recognized, "'[E]ach case must be considered in the context of the totality of its circumstances.'"  (*Id.* at p. 984, quoting *Dominguez, supra*, 39 Cal.4th at p. 1152.)  "'Where movement changes the victim's environment, it does not have to be great in distance to be substantial'" (*Robertson, supra*, at p. 986, quoting *People v. Shadden* (2001) 93 Cal.App.4th 164, 169), and isolating a victim, whether for rape or for robbery, may or may not increase the victim's vulnerability.  Each case must be analyzed on its own facts.  (*Vines, supra*, 51 Cal.4th at pp. 869–870; *Dominguez, supra*, at p. 1152.)

**21**     Two of the guns turned out to be Airsoft pistols, but the third gun was not found.

even more danger.  While terrified from the outset of the robbery, the movement of the victims to a different location away from the front door where police stood just on the other side to the back of the house where there was no exit, at gunpoint and under threat, suffices to support a reasonable inference that the movement to the back room increased the risk of trauma to the victims.  Therefore, based on the totality of the circumstances, we also find the evidence sufficient to support a finding that the victims' movement from the front room where the door was located to the rear of the house upon the arrival of police increased the risk of both physical and mental harm.

### 3. Appellants' Reliance on Contrary Authority

In support of his contrary position, Thomas, quoting *Daniels*, argues that "when in the course of a robbery a defendant does no more than move his victim around inside the premises in which he finds him—whether it be a residence, as here, or a place of business or other enclosure—his conduct generally will not be deemed to constitute the offense proscribed by section 209.  Movement across a room or from one room to another, in short, cannot reasonably be found to be asportation 'into another part of the same county.'" (*Daniels, supra*, 71 Cal.2d at p. 1140.)  "'[B]rief movements' that are 'solely to facilitate' the commission of a crime do not satisfy the asportation element of aggravated kidnapping." (Quoting *Daniels, supra*, at pp. 1130–1131.)  However, the court subsequently clarified, "We explained in *Daniels* (*id.* at p. 1140) that when a robber merely moves his victim around inside the premises in which he finds him, 'his conduct *generally* will not be deemed to constitute the offense proscribed by section 209.' (Italics added.)  The emphasized qualifier means, however, that there may be circumstances in which a robber can properly be convicted of kidnaping even though he does not take his victim outside the premises in question.  And by the same token, there may be circumstances in which a robber who does take his victim outside the premises—or finds him outdoors and moves him from one place to another—cannot properly be convicted of

24.

kidnaping." (*People v. Timmons* (1971) 4 Cal.3d 411, 415; accord, *People v. James, supra*, 148 Cal.App.4th at p. 456.)

As *Dominguez* recognized, "Robberies and sex crimes, the necessary predicates for an aggravated kidnapping (see § 209), can of course be committed in a variety of ways. To catalog all the myriad and various possible aspects of such crimes would be impossible. But beginning with the template established in *Daniels, supra*, 71 Cal.2d 1139, prohibiting increased liability for aggravated kidnapping for what are essentially brief and trivial movements in 'standstill' robberies or for movements 'merely incidental' to commission of the offense, through *Rayford, supra*, 9 Cal.4th 1, the applicable test under former section 208[, subdivision ](d) is clear: for aggravated kidnapping, the victim must be forced to move a *substantial distance*, the movement cannot be merely *incidental* to the target crime, and the movement must … *increase* the risk of harm to the victim. Application of these factors in any given case will necessarily depend on the particular facts and context of the case." (*Dominguez, supra*, 39 Cal.4th at pp. 1152–1153.)

In *Daniels*, four victims were raped and robbed. (*Daniels, supra*, 71 Cal.2d at pp. 1122–1125.) One victim was standing outside her car in her garage and was ordered into the backseat of her car, and the other three victims were moved around inside their homes. (*Ibid.*) This movement, however, was merely incidental to the underlying crimes in that it was limited to facilitating the crimes. (*Id.* at p. 1140.) In this case, James testified that he and Caroline were forced to move from the living room to the back office because the police were knocking on the front door. They were not moved merely to facilitate the robbery in progress by keeping them out of the way, keeping them under the control of the robbers as they searched rooms, or forcing them to assist the robbers in accessing items to steal.

For this reason, Thomas's citations to *Washington* and *Williams* are similarly unpersuasive. (*Washington, supra*, 127 Cal.App.4th 290; *Williams, supra*, 7 Cal.App.5th

644.) *Washington* involved a bank robbery, and the Court of Appeal found the movement of the victims inside the bank was insufficient to support the defendants' convictions for aggravated kidnapping. (*Washington, supra*, at p. 299.) The trial court and the People on review focused on the victims' movement to the vault, which was out of public view. (*Id.* at pp. 300–301.) As the appellate court explained, however, "there was no excess or gratuitous movement of the victims over and above that necessary to obtain the money in the vault. Also, given that the cooperation of two bank employees was required to open the vault, the movement of [two victims] was necessary to complete the robbery. After appellants took the money from the vault, they left quickly and without incident." (*Id.* at p. 299.) "[R]obbery of a business owner or employee includes the risk of movement of the victim to the location of the valuables owned by the business that are held on the business premises. Many retail businesses hold large amounts of cash or other valuable personal property on the business premises, frequently in a secure area away from public view, often in a safe or a vault. No principled distinction can be made between those businesses and the bank in question here. The fact thresholds within the business are crossed cannot elevate robbery to aggravated kidnapping, given that all of the movement occurred within close proximity to where the robbery commenced and the only thresholds crossed were those that separated appellants from the bank's property." (*Id.* at p. 300.)

*Williams* involved multiple robberies of electronics and cell phone stores. (*Williams, supra*, 7 Cal.App.5th at p. 653.) During the robberies, "employee victims [were moved] distances of 60, 50, and 40 feet, always inside the store, from locations closer to the front of the store (and visible from outside) to the rears of the store or to back rooms, where the merchandise and/or cash was kept. Consistently, these movements were incidental to the robberies, which all followed the same pattern. The robbers entered the stores through the front doors and moved the employee victims to areas closer to the merchandise they planned to take. None of the movements was

26.

unnecessary to the robbery." (*Id.* at p. 669.) "[T]he robbers had good reason to move the victims to the back of the store to achieve their objective of emptying the cages and safes of merchandise without detection by customers or other people outside the store. Their objective was robbery, not harm to the store employees, and the record does not contain sufficient evidence that moving the victims to the backs of the stores resulted in an increased risk of harm from the robberies." (*Id.* at p. 670.)

As previously stated, "[r]eversal is not warranted 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction.]"'" (*People v. Thomas* (2023) 14 Cal.5th 327, 378, quoting *People v. Bolin* (1998) 18 Cal.4th 297, 331; accord, *Zamudio, supra*, 43 Cal.4th at p. 357.) In this case, James's testimony that he and Caroline were moved at gunpoint from the front living room to the back of the house after police arrived and knocked on the door is sufficient to support the jury's finding that the movement was not merely incidental to the underlying robbery and that it increased the risk of harm to the victims. Therefore, we affirm Thomas's and Carr's convictions for aggravated kidnapping.

## II.     Reversal of Robbery as Lesser Included Offense of Aggravated Robbery

Next, it is well settled that "[a] defendant may be convicted of more than one offense based on the same act or a single course of conduct. [Citations.] However, a defendant may not be convicted of two such offenses if one is a necessarily included lesser offense of the other." (*People v. Robinson* (2014) 232 Cal.App.4th 69, 73, citing § 954 & *People v. Reed* (2006) 38 Cal.4th 1224, 1227; accord, *People v. Delgado* (2017) 2 Cal.5th 544, 570.) "To ascertain whether one crime is necessarily included in another, courts may look either to the accusatory pleading or the statutory elements of the crimes. When, as here, the accusatory pleading incorporates the statutory definition of the charged offense without referring to the particular facts, a reviewing court must rely on the statutory elements to determine if there is a lesser included offense. [Citations.] 'The elements test is satisfied if the statutory elements of the greater offense include all of the

statutory elements of the lesser offense, such that all legal elements of the lesser offense are also elements of the greater. [Citation.] In other words, "'[i]f a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former.'"'" (*People v. Robinson* (2016) 63 Cal.4th 200, 207.)

Thomas and Carr argue, and the People do not dispute, that robbery (count 12) is a lesser included offense of aggravated robbery (count 5) and, therefore, they are entitled to have their convictions for robbery reversed. We agree.

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear" (§ 211), and "every robbery which is perpetrated in an inhabited dwelling house … is robbery of the first degree" (§ 212.5, subd. (a)). Voluntarily acting in concert with two or more other persons during the commission of robbery within an inhabited dwelling house is aggravated robbery. (§ 213, subd. (a)(1)(A).) The greater conviction is controlling and, therefore, we shall reverse Carr's and Thomas's convictions on count 12 for first degree robbery. (*People v. Sanders* (2012) 55 Cal.4th 731, 736.)

## III. Section 654 Claim

### A. Imposition of Punishment For Both Aggravated Kidnapping and Aggravated Robbery

#### 1. Procedural Background

The probation reports for Thomas and Carr recommended the trial court stay the sentences on burglary (count 1) and robbery (count 12) under section 654 because they arose out of the same operative facts as aggravated kidnapping (count 3). Thomas was sentenced first, and he argued that section 654 also applied to the aggravated robbery sentence (count 5) because the crimes were committed pursuant to a single intent and objective—robbery of the victims. The prosecutor took the position that section 654 did not apply because aggravated kidnapping and aggravated robbery were "separate and distinct crimes involving separate and distinct elements …."

The trial court concluded section 654 did not apply to the sentence for aggravated robbery, reasoning:

> "[W]hile they are separate crimes with separate elements, the significant issue for the Court is the objective behind each crime, which in this case, based on these specific facts, are completely separate from one another.
>
> "The Court is mindful that, based on the evidence presented to this jury, the robbery in concert was fully engaged upon initially entering the residence, the [victim]s' residence, where there was rummaging throughout the living room. There were questions posed to the victims and so forth.
>
> "The kidnapping for robbery occurs when law enforcement arrives and begins announcing their presence. It is at that moment that, just as stated on the record previously from the testimony of one of the victims in this case, the two victims were escorted to a rear room, which definitely increases the risk of their physical and/or psychological harm. It was also separate and distinct from the robbery in concert that was already occurring and that continued to occur. For those reasons, the Court is going to impose consecutive sentencings."

Carr was then sentenced, and his counsel acknowledged the trial court's section 654 ruling but stated she disagreed with the finding of multiple objectives and cited the decision in *Neal*. (*Neal v. State of California* (1960) 55 Cal.2d 11, 19 ["Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one."], disapproved in part in *Correa, supra*, 54 Cal.4th at p. 331.)

On appeal, Thomas and Carr argue that the trial court erred in failing to stay the sentence for either aggravated kidnapping or aggravated robbery under section 654, resulting in an unauthorized sentence that requires correction.[22] The People's opening

---

[22]     As discussed in part III.B. of the Discussion, the People concede that remand is required for resentencing under Assembly Bill 518's amendment of section 654, effective January 1, 2022. At the time of sentencing, the bill had been submitted to the Governor for signature, and

brief does not address the merits of Thomas's and Carr's arguments and instead, based on their concession that resentencing is required under Assembly Bill 518, the People contend that the parties can readdress these issues on remand, rendering it unnecessary for us to decide whether the court imposed an unauthorized sentence. In their supplemental letter brief, they contend that the multiple-victims exception applies and that the trial court properly found multiple intents and objectives.

Remand for resentencing under Assembly Bill 518 and Senate Bill 567 is required, as discussed next, but we elect to resolve whether the imposition of an unstayed sentence for aggravated robbery was unauthorized because that determination will assist in informing resentencing on remand. As explained next, the multiple-victims exception to section 654 applies to aggravated kidnapping and aggravated robbery and, therefore, the trial court's imposition of an unstayed sentence for aggravated robbery was not unauthorized. In view of this determination, we need not address whether the trial court erred in its factual findings or conclusions of law when it found Thomas and Carr harbored multiple intents and objectives.

### 2.    Legal Principles

At the time of Thomas's and Carr's sentencing, section 654 provided, in relevant part, "An act or omission that is punishable in different ways by different provisions of law *shall be punished under the provision that provides for the longest potential term of imprisonment*, but in no case shall the act or omission be punished under more than one provision." (*Id.*, former subd. (a), italics added.) "[T]he statute is intended to ensure that [the] defendant is punished 'commensurate with his culpability'" (*People v. Harrison* (1989) 48 Cal.3d 321, 335 (*Harrison*)), and it "expressly prohibits separate punishment

---

Thomas's counsel requested that, based on the pending legislative change, the court either impose the lesser sentence for aggravated robbery rather than the greater sentence for aggravated kidnapping or continue sentencing so that Thomas could benefit from the anticipated change in the law.

for two crimes based on the same act, but has been interpreted to also preclude multiple punishment for two or more crimes occurring within the same course of conduct pursuant to a single intent" (*People v. Vargas* (2014) 59 Cal.4th 635, 642; accord, *Harrison, supra*, at p. 335).

Determining "[w]hether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry .…" (*People v. Corpening* (2016) 2 Cal.5th 307, 311 (*Corpening*).) "We first consider if the different crimes were completed by a 'single physical act.' [Citation.] If so, the defendant may not be punished more than once for that act. Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single "'intent and objective'" or multiple intents and objectives." (*Ibid.*)

This case involves a course of conduct rather than a single physical act. Generally, "'"[w]hether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one."'" (*People v. Capistrano* (2014) 59 Cal.4th 830, 885, quoting *People v. Rodriguez* (2009) 47 Cal.4th 501, 507, overruled in part on another ground in *People v. Hardy, supra*, 5 Cal.5th at pp. 103–104.) However, "'[t]he temporal proximity of the two offenses is insufficient by itself to establish that they were incident to a single objective.'" (*People v. Jackson* (2016) 1 Cal.5th 269, 354, quoting *People v. Capistrano, supra*, at p. 887; accord, *Harrison, supra*, 48 Cal.3d at p. 335.) "'If [the defendant] entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.'" (*People v. Porter* (1987) 194 Cal.App.3d 34, 38 (*Porter*), quoting *People v. Beamon* (1973) 8 Cal.3d 625, 639 (*Beamon*); accord, *Harrison, supra*, p. 335; *People v.*

31.

*Tom* (2018) 22 Cal.App.5th 250, 260.)  "Furthermore, 'multiple crimes are not one transaction where the defendant had a chance to reflect between offenses and each offense created a new risk of harm.'"  (*People v. Lopez* (2011) 198 Cal.App.4th 698, 717, quoting *People v. Felix* (2001) 92 Cal.App.4th 905, 915.)

Finally, and the focus of our analysis in this case, "section 654 does not apply to crimes of violence against multiple victims.  [Citation.]  The reason is that '"[a] defendant who commits an act of violence with the intent to harm more than one person or by a means likely to cause harm to several persons is more culpable than a defendant who harms only one person."'"  (*Correa, supra*, 54 Cal.4th at p. 341, fn. omitted, citing & quoting *People v. Oates* (2004) 32 Cal.4th 1048, 1063; accord, *Wilkoff v. Superior Court* (1985) 38 Cal.3d 345, 350–351; *Beamon, supra*, 8 Cal.3d at p. 638, fn. 10.)

### 3. Standard of Review

"'It is well settled … that the court acts "in excess of its jurisdiction" and imposes an "unauthorized" sentence when it erroneously stays or fails to stay execution of a sentence under section 654.'"  (*People v. Cuevas* (2008) 44 Cal.4th 374, 380, fn. 3, quoting *People v. Scott* (1994) 9 Cal.4th 331, 354, fn. 17.)  "Generally, 'in the absence of some circumstance "foreclosing" its sentencing discretion …, a trial court may base its decision under section 654 on *any* of the facts that are in evidence at trial .…"  (*People v. Carter* (2019) 34 Cal.App.5th 831, 842, quoting *People v. McCoy* (2012) 208 Cal.App.4th 1333, 1340; accord, *People v. Deegan* (2016) 247 Cal.App.4th 532, 545.)

We review the trial court's express or implied factual findings for substantial evidence, and its conclusions of law de novo.  (*People v. Brents* (2012) 53 Cal.4th 599, 618; *People v. Perez* (1979) 23 Cal.3d 545, 552 & fn. 5; *People v. Moseley* (2008) 164 Cal.App.4th 1598, 1603.)  "Our task is to review the trial court's *ruling*, not its reasoning."  (*People v. Turner* (2020) 10 Cal.5th 786, 807.)  "'"If right upon any theory of the law applicable to the case, [the ruling] must be sustained regardless of the considerations which may have moved the trial court to its conclusion."'"  (*Ibid.*; accord,

*People v. Capistrano, supra*, 59 Cal.4th at p. 886, fn.14; *People v. Zapien* (1993) 4 Cal.4th 929, 976.)

### 4. Analysis

Collectively, Thomas and Carr cite numerous decisions in support of the proposition that aggravated kidnapping and aggravated robbery have but a single criminal objective—robbery of the victim—and, therefore, section 654 prohibits multiple punishment for both crimes. (*People v. Lewis* (2008) 43 Cal.4th 415, 519; *Beamon, supra*, 8 Cal.3d at pp. 639–640; *People v. Knowles* (1950) 35 Cal.2d 175, 188–189; *People v. Barrios* (2021) 61 Cal.App.5th 176, 180–181.) Carr and Thomas acknowledge that in *People v. Smith* (1992) 18 Cal.App.4th 1192 (*Smith*) and *Porter, supra*, 194 Cal.App.3d 34, both of which involved an initial robbery followed by a kidnapping during which the victim was forced to drive to an ATM so the defendant could obtain additional cash, the appellate courts found section 654 did not apply.[23] However, they distinguish *Porter* and *Smith* on the ground that because the victims here were only moved within their home, "the kidnapping did not change the ordinary robbery 'into something new and qualitatively very different.'" (Quoting *Porter, supra*, at p. 38.)

Thomas's and Carr's reliance on this line of cases, however, overlooks a critical distinction that forecloses their entitlement to relief from their aggravated robbery sentences under section 654. The cases cited do not involve the multiple-victims exception, either because the crimes were committed against a single victim (*Beamon,*

---

**23** In *Porter*, the Court of Appeal explained that separate punishments for robbery and kidnapping for robbery were appropriate because "[w]hat began as an ordinary robbery turned into something new and qualitatively very different." (*Porter, supra*, 194 Cal.App.3d at p. 38.) The Court of Appeal in *Smith* found *Porter* analogous and applied it, while acknowledging there is tension between *Porter* and the California Supreme Court's earlier decision in *People v. Bauer* (1969) 1 Cal.3d 368, stating, "*Bauer* can be read to suggest that *when* the defendant forms the intent to take the property is irrelevant to the question of multiple punishment as long as the force or fear which is the central element of robbery [citation] continues uninterrupted. *Porter*, in contrast, seems to suggest that the timing of the defendant's intent is critical." (*Smith, supra*, 18 Cal.App.4th at p. 1198, fn. omitted.)

*supra*, 8 Cal.3d at pp. 630–631; *People v. Barrios, supra*, 61 Cal.App.5th at pp. 177–178; *Smith, supra*, 18 Cal.App.4th at pp. 1194–1195; *Porter, supra*, 194 Cal.App.3d at pp. 36–37), or because the crimes committed against multiple victims resulted in multiple convictions for the same offense (*People v. Lewis, supra*, 43 Cal.4th at p. 519; *People v. Knowles, supra*, 35 Cal.2d at pp. 177–178). "'The multiple victim exception, simply stated, permits one unstayed sentence per victim of all the violent crimes the defendant commits incidental to a single criminal intent.'" (*In re L.J.* (2021) 72 Cal.App.5th 37, 46, quoting *People v. Garcia* (1995) 32 Cal.App.4th 1756, 1784; see *People v. Deloza* (1998) 18 Cal.4th 585, 592 [robbery a violent crime]; *People v. Champion* (1995) 9 Cal.4th 879, 935 [same], overruled on another ground in *People v. Combs* (2004) 34 Cal.4th 821, 860*; In re Ford* (1967) 66 Cal.2d 183, 183–184 [multiple-victims exception applied to sentences for robbery and kidnapping for robbery]; *In re Wright* (1967) 65 Cal.2d 650, 656 [same].)

Here, Thomas and Carr were convicted of only one count of aggravated kidnapping and one count of aggravated robbery, each of which was committed against both James and Caroline. Imposition of unstayed sentences for one aggravated kidnapping and one aggravated robbery is "consistent with the rationale of the multiple-victim exception, which is to recognize the greater culpability of a defendant whose actions harm or threaten to harm multiple people." (*In re L.J., supra*, 72 Cal.App.5th at p. 46, citing *Correa, supra*, 54 Cal.4th at p. 341.) Therefore, we affirm the trial court's imposition of sentences for aggravated kidnapping and aggravated robbery under section 654. (*People v. Turner, supra*, 10 Cal.5th at p. 807; *People v. Capistrano, supra*, 59 Cal.4th at p. 886, fn. 14.) However, discussed next, remand for a full resentencing is appropriate under Assembly Bill 518 and Senate Bill 567, and, as previously stated, the parties may raise any other arguments they determine are relevant to resentencing.

34.

### B. Remand For Resentencing Required Under Assembly Bill 518

As amended by Assembly Bill 518, section 654 now provides, in relevant part, "An act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under more than one provision." (*Id.*, subd. (a), italics added.) Pursuant to *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), "[n]ewly enacted legislation lessening criminal punishment or reducing criminal liability presumptively applies to all cases not yet final on appeal at the time of the legislation's effective date." (*People v. Gentile* (2020) 10 Cal.5th 830, 852, citing *Estrada, supra*, at pp. 744–745; accord, *People v. Esquivel* (2021) 11 Cal.5th 671, 673, 675–676.) "This presumption 'rests on an inference that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.'" (*People v. Gentile, supra*, at p. 852; accord, *People v. Esquivel, supra*, at p. 675.)

The parties agree that Assembly Bill 518 applies in this nonfinal case pursuant to *Estrada*, and that appellants are entitled to remand for resentencing. We accept the People's concessions on both points and shall remand for resentencing.

## IV. Senate Bill 567

### A. Amendments to Section 1170

Finally, as amended by Senate Bill 567,[24] section 1170 provides, in relevant part, "When a judgment of imprisonment is to be imposed and the statute specifies three

---

[24] Thomas cites Assembly Bill No. 124 (2021–2022 Reg. Sess.) (Assembly Bill 124) as having amended section 1170 to add subdivision (b)(6). "During the 2021–2022 legislative term, three bills proposing changes to section 1170 in a variety of ways were introduced. They were Assembly Bill No. 124 (Stats. 2021, ch. 695, § 5), Assembly Bill No. 1540 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 719, § 2), and Senate Bill No. 567 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 731, § 1.3). All three bills were passed by the Legislature in September 2021, and approved by the Governor and filed with the Secretary of State on October 8, 2021. Senate Bill No. 567 (2021–2022 Reg. Sess.) bears the highest chapter number and is presumed to be the last of the three approved by the Governor. (Gov. Code, § 9510.) As such, Senate Bill No. 567

possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)." (*Id.*, subd. (b)(1).)[25] "The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).)

Relevant to Thomas's appeal, "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence. [¶] (B) The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense." (§ 1170, subd. (b)(6)(A)–(B); see § 1016.7, subd. (b) ["A 'youth' for purposes of this section includes any person under 26 years of age on the date the offense was committed."].)

## B. Analysis

The trial court sentenced Thomas and Carr to upper terms for burglary and aggravated robbery. In light of Senate Bill 567, Carr seeks remand for resentencing

---

(2021–2022 Reg. Sess.) prevails over Assembly Bill No. 124. (Gov. Code, § 9605, subd. (b).) To the extent there are conflicts between the three bills, Senate Bill No. 567 (2021–2022 Reg. Sess.) takes precedence. (*In re Thierry S.* (1977) 19 Cal.3d 727, 738–739.) As to subdivision (b)(6)(A) of section 1170, however, the substantive language in Assembly Bill No. 124, Senate Bill No. 1540 (2021–2022 Reg. Sess.), and Senate Bill No. 567 (2021–2022 Reg. Sess.) are not in conflict." (*People v. Banner* (2022) 77 Cal.App.5th 226, 243, fn. 2 (conc. & dis. opn. of Detjen, Acting P. J.); accord, *People v. Jones* (2022) 79 Cal.App.5th 37, 44, fn. 11.)

[25] Section 1170 was more recently amended by Assembly Bill No. 960 (2021–2022 Reg. Sess.), effective January 1, 2023, but those amendments are not relevant to the issues raised in this appeal.

under section 1170, subdivision (b)(1), and Thomas, who was 24 years old at the time of the crimes, seeks remand for resentencing under section 1170, subdivision (b)(6)(B). The People concede Senate Bill 567 is retroactive under *Estrada*. Further, they concede that remand to resentence Carr is appropriate given that the record is silent regarding what aggravating factors the trial court relied on for selecting upper terms and remand to resentence Thomas is appropriate because he was a youth at the time of the crimes.[26]

We agree that Senate Bill 567 applies retroactively pursuant to *Estrada*. (E.g., *People v. Dunn* (2022) 81 Cal.App.5th 394, 402–403, review granted Oct. 12, 2022, S275655; *People v. Banner, supra*, 77 Cal.App.5th at p. 240.) We also accept the People's reasoned concessions that remand to resentence Thomas and Carr is appropriate on this record.

---

**26** The People contend that in light of their concession Thomas is entitled to resentencing under section 1170, subdivision (b)(6)(B), based on age, his argument that he is also entitled to remand for resentencing under section 1170, subdivision (b)(1), is moot. We agree and do not consider that argument. We also need not consider Thomas's argument that the record reflects he suffered from childhood trauma. (*Id.,* subd. (b)(6)(A).) On remand, Thomas may raise any arguments under section 1170, subdivision (b)(1) and (b)(6), that he determines are relevant to his resentencing.

## DISPOSITION

Thomas's and Carr's convictions for the lesser included offense of first degree robbery (count 12) are reversed, and their cases are remanded for a full resentencing in light of Assembly Bill 518 and Senate Bill 567.  Following resentencing, the trial court shall forward an amended abstract of judgment to the appropriate authorities.  Thomas's and Carr's judgments are otherwise affirmed.


                                                                                                MEEHAN, J.

WE CONCUR:


HILL, P. J.


LEVY, J.